IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------

STONINGTON PARTNERS, INC., a Delaware )
corporation, STONINGTON CAPITAL )
APPRECIATION 1994 FUND L.P., a Delaware )
partnership and STONINGTON HOLDINGS, )
L.L.C., a Delaware limited liability company, )
                                              )
                    Plaintiffs,               )          No. 02-CV-10303 (PBS)
                                              )
        v.                                    )
                                              )
CARL DAMMEKENS, KLYNVELD PEAT )
MARWICK GOERDELER )
BEDRIJFSREVISOVEN, KPMG LLP, )
ERWIN VANDENDRIESSCHE, DIRK )
CAUWELIER, MARC G.H. DE PAUW, )
FLANDERS LANGUAGE VALLEY FUND, )
FLANDERS LANGUAGE VALLEY )
FOUNDATION, L&H INVESTMENT CO. )
N.V., MERCATOR & NOORDSTAR N.V., )
LOUIS VERBEKE, HANVIT BANK, )
SHINHAN BANK and CHOHUNG BANK, )
                                              )
                    Defendants.               )

-----------------------------------------------------------

## DECLARATION OF PROFESSOR MATTHIAS EDWARD STORME
## IN SUPPORT OF PLAINTIFFS' OPPOSITION TO KPMG-BELGIUM'S
## MOTION TO DISMISS

PROFESSOR MATTHIAS E. STORME hereby declares pursuant to 28 U.S.C. § 1746 that:

### Qualifications

1.      I am a professor of civil and comparative law at Katholieke Universiteit (K.U.) Leuven, in Leuven, Belgium, a member in good standing of the Bar of Brussels, Belgium, and a member of the law firm of Keuleneer, Storme, Vanneste, Van Varenbergh, Verhelst, having offices in Brussels, Belgium.

2.      I am a citizen and resident of Belgium, with an extensive background in Belgian and international law.  My curriculum vitae is annexed hereto as Exhibit "1."  In 1981, I obtained a license in law (the equivalent of a Masters Degree), magna cum laude, from K.U. Leuven, concentrating on general legal principles of Belgian law.  In 1982, I obtained a Master of Arts

degree in philosophy from Yale University. I am also a graduate fellow of the Belgian-American Educational Foundation. In 1989, I obtained a Juris Doctorate (a Ph.D.-equivalent) from K.U. Leuven, with a thesis on good faith in the law of obligations. I studied under the auspices of Professor Walter van Gerven, advocate general of the Court of Justice of the European Communities.

3.      I am currently a senior tenured law professor at K.U. Leuven, and a junior professor at the University of Antwerp, in Belgium. I teach civil law of property and obligations, as well as comparative law, international private law and European Communities law. I have also taught law at the University of Amsterdam (1990-1993), and have been a guest law lecturer and/or guest law professor at Erasmus Universiteit Rotterdam and Universiteit Groningen in the Netherlands, Université de Rouen and Université de Lille in France, in Universiteit Ghent and FUNDP (University of Namur) in Belgium, Universiteit Stellenbosch in South Africa, Hebrew University Jerusalem in Israel, among others.

4.      I have been an advocate in the Bar of Brussels[1] since 1987. Between 1996 and 1998, I was a member of the Council of the Brussels Bar. Subsequently, I was elected a member of the General Council of the Flemish Bar, which oversees the activities of each of the local bars. I am currently a member of the Commission for the Recognition of Permanent Education, which oversees continuing legal education in Belgium. I have acted as an arbitrator in international (ICC) and domestic (CEPINA/CEPANI) disputes.

5.      Since 2000, I have been on the editorial board of the "Tijdschrift voor Privaatrecht" (the Journal for Private Law), the leading Belgian review in that area of private law (including civil procedure). Since 1992, I have been the Executive Editor of the "European Review of Private Law/Europäische Zeitschrift für privatrecht/ Revue européenne de droit privé," and a member and secretary of the "Commission on European Contract Law" (the "Lando-commission"), a group of professors commissioned to prepare the "Principles of

---

[1]      As in the United States, attorneys in Belgium gain admission to local law bars, rather than a national law bar.

European Community Law," *i.e.*, to reformulate and universalize the law of contracts in Europe.
I am also a member of the Study Group on a European Civil Code. I have written extensively in
the areas of comparative and Belgian civil law, and particularly contract, property, civil
procedure and jurisprudence in Belgium. A comprehensive index of my publications, most of
which are in Dutch, the teaching language of K.U. Leuven, is annexed hereto as Exhibit "2". In
particular, I have written articles addressing subjects such as:

- General principles of the Belgian law of evidence
- Professional ethics and procedural fairness (Report IX World Congress on
  Civil Procedure)
- Good faith and fair dealing in civil procedure and under the law of
  evidence
- Difficulties of gathering evidence under Belgian law, translated into
  English under the title, "The Facts on Trial."

### Purpose Of This Declaration

6.     I have been consulted by the Plaintiffs in this action in connection with the motion
to dismiss that was filed by defendant KPMG Bedrijfsrevisoren ("KPMG-B") for forum non-
conveniens. I have reviewed and am fully familiar with the Plaintiffs' complaint, which relates
to a massive fraud involving Lernout & Hauspie Speech Product, N.V. ("L&H"). I have also
reviewed and am fully familiar with the forum non-conveniens arguments raised by KPMG-B in
its Motion, and the facts set forth in the Declaration of counsel for the Plaintiffs.

7.     The purpose of this Declaration is to supply the Court with information
concerning the legal system and substantive laws of Belgium that is relevant to the forum-related
matters raised by the complaint and the Motion.

### The Belgian Litigation Process

8.     A plaintiff starts a Belgian lawsuit by filing a complaint that sets forth the legal
basis for the action and the plaintiff's claim for relief. Under the provisions of the Act of June
15, 1935 (as amended i.a. by Act of September 23, 1985), the pleadings must be filed in the

language of the Court, which is either Dutch or French (depending on the Court rules and, in some cases, the plaintiff's choice).[2]

9.      Under Art. 624, 1° and 635, 2° Judiciary Code (gerechtelijk wetboek/Code judiciaire), the venue for the action would be set at the location where defendants reside or otherwise maintain their principal offices.  Although Professor van Houtte contends that Brussels is an appropriate forum as the district in which KPMG-B resides (van Houtte Decl. ¶6), venue would also be appropriate in Ieper (Ypres), where Lernout & Hauspie Speech Products, N.V.'s ("L&H") corporate headquarters are located.

10.     For the Belgium Courts to have jurisdiction, Belgian law requires that at least one defendant must have its residence or domicile in Belgium.  *See* 635, 10Jud.C. ("Foreigners can be brought before the courts of Belgium in the following cases ... if there is more than one defendant, of which one at least has its domicile or residence in Belgium").  However, for purposes of determining whether there is jurisdiction over non-Belgian entities, a Belgian court does not inquire into whether a non-resident defendant has purposely directed his activities toward Belgium, or has purposely availed himself of the privilege of doing business in Belgium. Nor does the Court determine the nature and extent of the contacts, if any, between the non-resident defendant and Belgium.  Rather, the Court's sole inquiry is whether the claim against the non-resident defendant is sufficiently connected to the claim against the Belgian defendant.

11.     For more than a dozen independent reasons, I disagree with Professor van Houtte's conclusion that any Belgian Courts "offer plaintiffs an adequate alternative forum in which to pursue their claims against [KPMG-B]" (van Houtte Decl. ¶¶4, 21), and believe that the action would be better suited for prosecution in the United States, Plaintiffs' chosen forum.

12.     **First**, this action seeks damages based on violations of U.S. securities laws, as

---

[2]      The rules of evidence do not formally require parties to translate evidentiary documents attached to their pleadings, and in simple cases Belgian judges may be willing to accept documents in English without demanding their translation.  However, in more complex cases, such as this one, judges will usually require translations of the English materials, and will certainly require translations of Korean or Chinese materials.

well as claims of common law fraud and negligent misrepresentation. Accordingly, the nature of this action is one of tort. As a result, as detailed below (in ¶¶ 36-39), Belgium would not provide Plaintiffs any remedy for most of their claims, by operation of its legal doctrine of "*non-cumul.*" The doctrine of *non-cumul* in Belgian law prevents a party that has a contractual relationship with another party from pursuing a tort claim against that party. The underlying notion is that where a relationship has been addressed by a specific set of legal arrangements designed by the parties (such as a contract), claims arising out of or related to that relationship should be governed by those arrangements, rather than by general principles of tort law. In the present case, on account of the merger agreement entered into between plaintiffs and L&H, plaintiffs had precisely such a contractual relationship with L&H. Thus, under the doctrine of non-cumul, because Plaintiffs had a <u>contractual</u> relationship with L&H, Plaintiffs' <u>tort</u> claims would be barred as against L&H's officers and directors, as well as the accountants or auditors of L&H because they are likely to be deemed "organs" of L&H. Prof. Van Houtte argues that a remedy is available under the Belgian Companies Act, but any claims brought under the Companies Act would also be subject to *non-cumul. Non-cumul* also applies to other Belgian tort claims.

13.    <u>Second,</u> as detailed below (in ¶¶ 40-44), under the choice of law principles that would be applicable to any of Plaintiffs' claims that are not subject to Belgian law, the Belgian Court would be required to apply one or more foreign laws, including the laws of the U.S., Korea, and Singapore. This would impose on the Belgian Court an extraordinary and unprecedented burden that it is not qualified to bear.

14.    <u>Third,</u> if this action were brought in Belgium, there would almost certainly be an inordinate delay in trying Plaintiffs' claims as a result of criminal proceedings initiated against certain of the defendants in the action. According to Belgian media, a Belgian investigative magistrate is conducting criminal investigations of former L&H officers and directors Jo Lernout, Pol Hauspie, Carl Dammekens, Gaston Bastiaens, and Nico Willaert, and, notably, KPMG-Belgium, former KPMG-Belgium audit partner Paul Behets, and the chairman of the board of directors of KPMG-Belgium, Theo Erauw (*see* articles printed out from *De Standaard*

*Online*, copies and certified translations of which are attached as Exhibit "3"). The Office of the Royal Prosecutor at Ieper confirmed that KPMG-Belgium remains a subject of the investigation (*see* March 22, 2000 letter from J.M Coppens to M. Storme, a true and correct copy and certified translation of which are attached hereto as Exhibit "4"). Under Belgian law, civil trials are suspended as long as a criminal proceeding in the same or a related matter is pending. In Brussels and Ieper (Ypres), complex criminal and civil proceedings involving commercial fraud typically last approximately 3-5 years – and as much as 7 years – through the appellate process (as described below). Accordingly, any civil suit that the Plaintiffs bring would be enormously delayed by as much as five or more years, and it will likely take between eight and twelve years for the litigation to be concluded.

15.     **Fourth,** even if the criminal investigation is resolved quickly, the Plaintiffs would not receive a quick result if their action were dismissed and re-filed in Belgium. Because the Brussels and Ieper (Ypres) courts are backlogged, apart from very simple cases, it can take from 1 ½- to 2 years from the time at which the complaint is filed until the first trial date at which the parties present their arguments from the pleadings and documentary evidence. Depending on the outcome, the Court is likely to order several additional hearings, which may include the production of documents or the examination of witnesses, and it could take several more years before the final trial date.

16.     In addition, the appellate Courts of Brussels and Ghent (the appellate Court for Ieper (Ypres)) are seriously congested. From the time that an initial judgment is rendered after trial, it can take from 2 to 2 ½ years before a final judgment issues from the appellate court.

17.     **Fifth,** there is no mechanism similar to pretrial "discovery" in Belgium (from the parties or from third-party witnesses), as that term is generally used in the United States. For example, Belgian procedure does not contain any provisions for the taking of depositions (either orally or in writing), or for the use of interrogatories or requests for admission.

18.     Although a Belgian Court may issue an order compelling the production of documents at the request of a party, such requests are subject to strict standards of relevance. In

general, the Court will only order a party to provide investigative measures under the following conditions:

(a)     The request is aimed at specific, legally relevant facts. "Legally relevant" means that the outcome of the case depends at least partially on these facts;

(b)     The specified facts can, according to the Belgian rules on evidence, legally be proven by such means (e.g. some types of transactions may only be proven in writing); and

(c)     The requested document is useful, i.e., it can in fact prove the specified, legally relevant facts.[3]

19.     If one of these conditions is not met, the Court will deny the request.[4] As an example of how rigorous these standards are in practice I believe that the Court would deny a request for production of "KPMG-Belgium's audit work papers," because the Court would consider such a request to be overly broad.

20.     The Court's authority to order the production of documents is further constrained by Article 877 of the Judicial Code. Article 877 requires that the documents be adequately specified, and that the party seeking discovery show that the entity to which the request is addressed is in possession of the documents. Requests for general categories of documents will be denied.[5] The decision is wholly within the judge's discretion and cannot be appealed separately.

21.     **Sixth,** witness testimony does not play a significant role in Belgian legal proceedings. Belgian Courts generally distrust witness evidence, preferring documentary

---

[3]     M.E. STORME, "Goede trouw in geding en bewijs" (Good faith in procedure and proof), Tijdschrift voor Privaatrecht 1990, (353), 477, nr. 84.

[4]     R. STÜRNER, Why Are Europeans Afraid to Litigate in the United States, Rome, Centro di studi e ricerche di diritto comparato e straniero, 2001, p. 3.

[5]     S. STYNS, "De overlegging van stukken in het Gerechtelijk Wetboek" (The submission of documents in the Judicial Code), Jura Falconis 1984-85, (199), 209.

evidence whenever it is available. If documents are not available, the Belgian Courts prefer to entrust a court-appointed expert with a fact-finding mission rather than resorting to the cumbersome process of witness testimony.

22.    Accordingly, even for cases involving claims of fraud where credibility determinations may be important, trials in Belgium usually involve only oral arguments by the lawyers and judicial consideration of the pleadings and documentary evidence. The scope of live witness testimony at trial is severely limited by the same strict standards of relevance and admissibility that apply to orders compelling the production of documents (*see* Belgian Supreme Court: Cass. February 8, 1979, J.T. 1979, p. 320), and such testimony is the exception and not the rule. Additionally, on the rare occasions that such testimony is ordered, the Judge conducts the questioning – there is no direct or cross-examination by counsel. The testimony of defendants is not given under oath.[6]

23.    **Seventh**, the Belgian Courts have no mechanism in place for obtaining evidence (*i.e.*, documents or testimony) from third-party witnesses who do not reside in Belgium. I believe that this is a very significant litigation problem based on counsel's Declaration, which describes numerous essential-third party documents and witnesses outside of Belgium. The van Houtte Declaration avoids this problem by basing its analysis on the contested factual assumption that almost all of the alleged wrongdoers, evidence, and witnesses are located in Belgium.

24.    **Eighth**, if this case remained in the United States, it would be just as easy (or only marginally more difficult) for the parties to obtain documents from third-party witnesses residing in Belgium. Plaintiffs would need to make a proper request to the Belgian Courts satisfying the standards set forth in ¶ 18 above, identifying the needed documents, and providing a good basis for the Court to order their production.

25.    The Belgian Courts recognize the importance of international comity and reciprocity with respect to foreign lawsuits that involve parties or third-party witnesses in

---

[6]    The testimony of third parties is under oath.

Belgium. Accordingly, in response to a proper request from foreign litigants, I believe that the Belgian Courts would issue whatever orders are appropriate and necessary to secure such persons' documents. Witness testimony could also be compelled, subject to the same standards as requests for production of documents; the witness would be called before the Belgian Court, and a judge would ask the questions requested by the foreign litigant. I have absolutely no reason to suspect that the Belgian Courts would exercise their discretion to deny an otherwise proper request for assistance in connection with a foreign lawsuit. Certainly, there is nothing in Belgian law that would prevent the Belgian Courts from issuing such orders in this action. The only "blocking statutes" in Belgian law relate to maritime and air transport and do not apply to this case.

26.    **Ninth**, as Professor van Houtte concedes, if this action were litigated in Belgium, the Plaintiffs would be unable to present their case to a jury or to seek punitive damages. (van Houtte Decl. ¶¶ 10, 20).

27.    **Tenth**, if this action were litigated in Belgium, the parties would likely be unable to obtain documents or evidence from any of the accountants who allegedly had significant involvement in the transactions underlying the Plaintiffs' claims, because there is an accountant/client privilege under Belgian law. In Belgium, all documents relating to the auditor's work for the client, with the exception of documents that are required to be publicly disclosed (e.g., the final audit report), are considered privileged. Institute of Accountants Rule 224 specifies that audit work papers are privileged. Under the privilege, auditors may not disclose confidential or privileged information, except where necessary to defend themselves in Court or where disclosure is imposed by law. The decision to disclose documents in defense of a lawsuit is left to the discretion of the auditor, and cannot be compelled.[7] This privileges follows

---

[7]    Mr. Jozef Lievens explicitly advises auditors who are interrogated in relation to a statutory report to refer only to the report, because any additional declarations or explanations could lead to the conclusion that the auditor did not fulfill his task appropriately. (Jozef Lievens, "Beroepsgeheim en zwijgplicht van de bedrijfsrevisor, de accountant en de belastingsconsulent," in *Stukken en Documenten B.C.N.A.R.* 1991-1, p. (87ff) 94 (Also published in 1986 by the official Institute of Auditors)). Mr. Lievens reminds us that the auditor can invoke the professional privilege also when he is defending himself. The professional authorities (Institute

from Art. 27.2 of the Act of July 22, 1953 on the Institute of Accountants, as modified by art.

61A Act of February 21, 1985, and the effect of the privilege is governed by general rules for

professional/client privileges, in particular Art. 458 Penal Code. I believe that any accountant,

including foreign accountants who are not licensed in Belgium, could successfully invoke this

privilege if asked to provide evidence in an action pending in Belgium.

28.     **Eleventh,** the appellate process in Belgium is essentially a re-trial of the entire

case. The appellate court pays no deference to the lower court's judgment, but instead conducts

an entirely new trial, which may include new arguments and evidence. This procedure forces the

litigants to incur, for a second time, the substantial cost, delay and disruption associated with a

lower court trial.

29.     From my experience, and given the nature and magnitude of the claims at issue in

this case, I believe that it is virtually certain that the losing party would, in fact, appeal a lower

court judgment if this action were brought in Belgium.

30.     **Twelfth,** KPMG-B suggests in its dismissal motion that it may be more efficient

to litigate Plaintiffs' claims in Belgium because bankruptcy and shareholder proceedings are

already pending there. I do not agree. This action would not be consolidated with the

bankruptcy proceeding because, according to Art. 574, 2° Jud.C., the Commercial Court of Ypres

(Bankruptcy Chamber)'s exclusive jurisdiction pertains only to claims directly caused by the

bankruptcy, the adjudication of which requires the application of specific provisions of the

Bankruptcy Act (*e.g.,* claims involving different creditors of the bankrupt company or claims

against the insolvency administrator). Moreover, from my review of the complaint, I believe that

the claims raise unique issues of reliance and damages that make them ill suited for consolidation

with ordinary shareholder lawsuits.

31.     **Finally,** I disagree with Professor van Houtte's assertion in his Declaration that a

U.S. court decision could be difficult to enforce in Belgium. I note, preliminarily, that Professor

---

of Auditors) require their members not to disclose any information in civil proceedings, even
where they are authorized by law to do so.

van Houtte's use of the word "could" is quite telling. I do not believe that a Belgian Court "would" encounter any of the difficulties to which Professor van Houtte refers. From my experience and research, I am aware of no case in which a Belgian court reexamined the judgment of a U.S. court and refused to enforce it. I have no reason to believe the result would be any different here.

32.     A foreign judgment is enforced through a special type of adversary proceeding called *exequatur*, pursuant to Article 570 of the Judicial Code. The court before which the *exequatur* is sought does not have the power to alter the foreign decision; it can only ratify, totally or partially, the foreign decision. If Belgium has not entered into a treaty with the country in which the judgment originates, as with the U.S., the Belgian court fully reexamines the case in the *exequatur* proceedings. To grant *exequatur*, the following conditions must be fulfilled:

(a)     **Public policy.** The Belgian court examines whether the substance of the foreign judgment is contrary to Belgian public policy. The public policy argument is more significant in controversial areas, like family law (*e.g.*, repudiation of a wife in Muslim countries), than it is in commercial cases.[8]

(b)     **Due process.** Belgian law requires that the foreign court has followed a standard procedure that spells out the rights of the parties.

(c)     **Jurisdiction.** The foreign judgment must have been rendered by a court having competent jurisdiction over the case. This jurisdiction should not be based solely on the nationality of the claimant.

(d)     **Finality.** The foreign judgment must be final.

(e)     **Authentic copy.** The Belgian court verifies whether the copy of the foreign judgment meets all the authenticity requirements of the law of the country from which the judgment was rendered.

33.     In my experience, these requirements would not be a serious obstacle for

---

[8]     P. WAUTELET, "Artikel 570 Gerechtelijk Wetboek"(Article 570 Judicial Code), in X. (ed.), Gerechtelijk recht. Artikelsgewijze commentaar met overzicht van rechtspraak en rechtsleer, Antwerpen, Kluwer Rechtswetenschappen België, 1998, p. 19, nr. 21.

enforcement of a U.S. judgment in this case. This case does not appear to implicate any matters of Belgian public policy. Although a Belgium court will not enforce a U.S. judgment that includes an award of punitive damages, I believe that the plaintiffs can segregate any punitive damages award and only seek enforcement of the compensatory aspect. For the possibility of segregation and partial exequatur in general, see, e.g., Trib. 1ˢᵗ Instance Brussels March 6, 1970, *Journal des tribunaux* 1970, p. 298.

34.     In addition, as discussed in ¶ 30, no bankruptcy or other civil proceedings taking place in Belgium are closely related to this action. In any event, there is no reason to believe that any finding by a United States District Court would contradict the findings in those Belgian proceedings.

35.     Based on my review of the complaint, I do not believe that a Belgian Court would consider it inappropriate for a U.S. Court to exercise jurisdiction over KPMG-B.

### Substantive Law Issues

36.     If Plaintiffs were to re-file their Complaint in Belgium, the Belgian Court would classify Plaintiffs' claims as "torts."

37.     Based on this classification, Plaintiffs would have no remedy in Belgium against most of the defendants, by operation of the doctrine of "*non cumul.*" That doctrine provides that tort claims may not proceed against any parties whose relationship is, or may be deemed to be, governed by a contract between them. Such parties include the signatories to the contract, as well as third parties to whom the signatories have entrusted performance (*i.e.* agents of the contracting party, and, in case the case of legal entities, "organs" of the contracting party).[9]

38.     It is well-settled under *non-cumul* that Officers and Directors enjoy a "quasi-immunity" from suits based on their relationships as organs or agents of the company.[10] It is equally well-settled that the doctrine applies both to actions for damages based on non-

---

[9]      *Non-cumul* does not apply where the breach of duty also constitutes a criminal offence. But, if KPMG-Belgium is ultimately charged with a crime, as discussed above, Plaintiffs' case would be delayed pending resolution of the criminal proceedings.

[10]     Belgian Supreme Court: Cass. November 7, 1997, Arr. Cass. 1997, 1093.

performance of a contract and to actions based on pre-contractual negligence or breach of a pre-contractual duty (such as misrepresentations) of the contracting party, its agents or its organs.[11] Based on these two principles, I believe that a Belgian Court would conclude that the doctrine of *non cumul* precludes Plaintiffs from asserting any claims against the defendants who are (or were) L&H principals. That is, because the Plaintiffs entered into a contractual relationship with L&H through a merger agreement (as alleged in the complaint), Plaintiffs would be unable to bring a tort claim in Belgium against L&H or any of its officers and directors.

39.     In addition, a Belgian Court could conclude, with respect to any action under Belgian law, including the Companies Act, that the accountants and auditors of L&H also enjoy immunity from suit in Belgium because each has an underlying contractual relationship with L&H and because a <u>commissaris-revisor</u> (*i.e.*, statutory auditor) is traditionally considered an organ of a company. Although no case law discusses whether auditors are organs of a company specifically for purposes of *non-cumul*, there is no logical basis for distinguishing between a company's auditors and its directors. In both cases, the company has entrusted the third parties to act for it.

40.     For claims against any defendant who is not immune from suit under the doctrine of *non cumul*, a Belgian court would apply a tort-based conflict of laws analysis. Under that analysis, the Belgian court applies the law of "the place of the wrong" (*lex loci delicti*). Although it is unclear whether "the place of the wrong" is where the wrongful conduct took place or where the damage was inflicted,[12] the dominant view is to apply the law of the place where the wrongful conduct took place.[13]

---

[11]     H. VANDENBERGHE and M. VANQUICKEBORNE, "Onrechtmatige daad - overzicht van rechtspraak" (Torts – review of case law), Tijdschrift voor Privaatrecht 1992, 1953.

[12]     There is case law of the Court of Justice of the European Communities stating that both should be considered the place of the wrong, but this applies only to the question which court has competence and does not relate to the question of the applicable law (ECJ Nov 30,- 1976, Handelskwekerij Bier v Mines de Potasse d'Alsace, Case 21/76, Jur., 1976, II, 1735.

[13]     *E.g.*, Georges VAN HECKE, Bilateral studies in private international law published for the Parker School of foreign and comparative law, Columbia University new York,

41.     Given the multifaceted, international claims in this litigation, and the fact that alleged wrongful acts occurred in a number of countries (including Belgium, the United States, Korea, and Singapore), the Belgian Court would likely apply the laws of several different jurisdictions. Specifically, the Court would likely apply Belgian law to acts occurring in Belgium; U.S. law to acts occurring in the U.S.; and the laws of Singapore and Korea to acts occurring in those countries.

42.     Based on Belgium's choice of law principles, I strongly disagree with Professor van Houtte's assertion that this action, if filed in Belgium, would basically be governed by the Belgian Companies Act or Belgium's general rules of liability. I also disagree that a Belgian Court would be willing to apply its own law extra-territorially, with respect to any conduct that occurred outside of Belgium.

43.     There is no statute or rule of law or procedure in Belgium that bars the Court from adjudicating a claim arising (in whole or in part) under foreign law. However, the Belgian Courts do not have significant experience adjudicating claims arising under the laws of the United States, Korea, or Singapore, and they would likely encounter extreme hardship if they were forced to apply these laws.

44.     Specifically, for the Belgian Courts to apply foreign law, the disputing parties – or the Courts themselves – would have to retain expert witnesses to educate the Courts concerning such laws (through live testimony or affidavits) with all of their nuances, complexities, and disparate applications in various courts. This process would drain the resources of the Belgian Courts. Moreover, not only would the application of foreign law burden the Belgian legal system at the initial stages of the litigation, but it would continue to pose substantial hardship through trial as well as appeal. As noted above (in ¶¶ 28-29), a complex case such as this one is virtually certain to be appealed by the losing party, who will be entitled on appeal to what amounts to a new trial.

---

N° 17, American-Belgian private international law, Oceana Publications New York 1968, p. 71 (citing the Belgian Supreme Court in ruling in favor of the place of the wrong, Cour de cassation 17 May 1957, Bologne v. Sainte, Pasicrisie 1957 I p. 1111.)

45.     Further, if this action were filed in Belgium, it would be stayed until the criminal
proceedings are completed, because in Belgium civil trials are suspended for as long as a related
criminal proceeding is pending.  As set forth above (in ¶ 14), criminal proceedings in Belgium
typically take between five and seven years to complete, and plaintiffs would not be able to
prosecute their claims during this time.

I declare under penalty of perjury, under the laws of Belgium and the laws of the United States of America that the foregoing is true and correct and that it was duly executed at Brussels, Belgium on May 6, 2002.

Matthias E. Storme

55198.1

# EXHIBIT 1

# CURRICULUM VITAE MATTHIAS E. STORME

- born in Gent, on July 8, 1959, Belgian nationality
- married, 4 children
- private address : Zuidbroek 49, 9030 Gent-Mariakerke, 09-3295104, fax 09-3295106 matthias.storme@ks4v.be

## Studies, Academic career :

- Greek-Latin Humanities at the St-BrabaraCollege (S.J.) Gent 1970-1976
- Lic. Iur. K.U.Leuven 1981 (magna cum laude); Bacc. Philos. K.U. Leuven (cum laude); M.A. (Philos.) Yale University 1981
- C.R.B. Graduate Fellow of the Belgian-American Educational Foundation 1981-82;
- Stipendiar der Max-Planck-Gesellschaft (Germany) 1984-85
- studied at the *Università degli studi di Bologna*, 1983-1984; *Max-Planck-Institut für internationales und ausländisches Privatrecht*, Hamburg, 1984-85
- researcher in law, National Research Council 1983 - 1987, teaching assistant, law school Kaholiek Universiteit Leuven 1987-1989
- Doctor iuris K.U. Leuven 1989 with a thesis on good faith in the law of obligations (promotor : prof. Walter van Gerven, advocate general Court of Justice European Communities)
- Junior professor University of Antwerp since 1989, University of Amsterdam 1990-1993, K.U. Leuven since 1991
- senior professor ("hoogleraar", since 2001 "buitengewoon hoogleraar") K.U. Leuven, since 1996, Universiteit Antwerpen (since 2002) in the field of civil law (property & obligations) comparative law and european community law
- Guest professor or lecturer at the Univeristies of : Erasmus Universiteit Rotterdam, Université de Rouen, Universiteit Utrecht; Universiteit Groningen, Universities of Budapest and Miskolc, Universiteit Gent, Hebrew University Jerusalem, Université de Lille, University of Stellenbosch, FUNDP Namur, etc.
- research fellow University of Stellenbosch (South-Africa) (1998)

## Professional career outside the University :

- 1995-1996 President of the Dutch Young Bar of Brussels
- advocate at the Bar of Brussels (since 1987); member of the Council of the Brussels Bar 1996-1998; member of the General Council of the Flemish Bars (1998-2000)
- since 1993 member of the Council of the Flemish Lawyers' Association (VJV), since 1998 member of the Board.

## Scientific activities

- Executive editor of the "European review of private law / Europäische Zeitschrift für privatrecht / Revue européenne de droit privé", since the beginning (1992)
- since 1992 member and secretary of the "Commission on European Contract Law" (so-called Lando-commission), preparing the "Principles of European Contract Law"
- member of the Study Group on a European Civil Code (chairman Prof. C.v.Bar), since 2000

- Member of the editorial Board of the leading Belgian law review "Tijdschrift voor privaatrecht" (since 2000)
- reporter and/or organisator at/of many Congresses or Colloquia, national and international
- promotor of several research projects in the field of harmonisation of law and the European Union, funded by the Flemish research council (FWO)
- member of the Research group "The common core of E.C. Private law", Universita degli studi di Trento.
- member of numerous scientific associations (l'Académie des privatistes européens - Academy of european private lawyers , Gesellschaft für Rechtsvergleichung, Association Henri Capitant des amis de la culture juridique française, Associazione R.B. Schlesinger per lo studio del diritto europeo, Associazione internazionale per la ricerca storico-giuridica e comparativa (ARISTEC), Belgisch-deutsche Juristenvereinigung,, etc.)

## Associations

- President of the "Verbond der Vlaamse Academici" (since 1996)
- President "Order of the Flemish Lion" (since 1998)
- member of the Board "Algemeen Nederlands Verbond" (since 2001)

## Some publications

Most publications are in Dutch (mother tongue and teaching language at the Catholic University of Leuven), some in other languages. A complete list can be found on: http://www.storme.be/articles.html.

2

# EXHIBIT 2

**Juridische bijdragen van / Writings in law by Matthias E. Storme**

**Doktoraal proefschrift / Doctoral thesis**

- *De invloed van de goede trouw op kontraktuele schuldvorderingen*, proefschrift
verdedigd aan de K.U.Leuven 7 juli 1989 (in de handelsuitgave 463 + XLVIII + 39 pp.)

**Boeken e.d. / Books**

a) als auteur

- *De invloed van de goede trouw op kontraktuele schuldvorderingen*, geaktualiseerde
handelsuitgave van het proefschrift verdedigd aan de K.U.Leuven 7 juli 1989, Story,
Brussel 1990, 463 + XLVIII + 39 pp. (X)

- achtste, door mij volledig herwerkte uitgave van M.L. STORME, *Algemene Inleiding
tot het recht*, Kluwer, Antwerpen, 1990, 380 pp

- *Unidroit Beginselen van internationale handelsovereenkomsten*, auteur van de
Nederlandse vertaling (met N. Frenk, m.m.v. M.J. Hoekstra en S.A. Gijsen), Vermande
Lelystad 1997, 244 pp.

b) als redakteur

- *Bakens in de Storm. Opstellen over samenleving en toekomst aangeboden aan prof.
Marcel Storme ter gelegenheid van zijn emeritaat*, Lannoo Tielt 1995, 241 pp. (redaktie
en Woord vooraf).

- *(On)afhankelijkheid en (on)macht van de rechter*, AJT-Dossier 1996 nr. 8, p. 97-116,
met Voorwoord van M.E. Storme

- *De retroactiviteit van rechtsregels*, referatenbundel van de studiedag Jura Falconis 14
februari 1998, Jura Falconis Libri Leuven 1998, 160 p.

**Artikels in of gedeelten van boeken**

a) internationaal of buitenlands

- bijdrage over België aan *Defensive tactics against hostile takeovers in eight EEC
Countries*, Giuffré Milano 1990

- "Déontologie professionnelle et conduite loyale du procès - Professional ethics and
procedural fairness", belgisch rapport voor het IXe Wereldcongres voor Procesrecht,
Coimbra/Lissabon augustus 1991, in *Rôle et organisation des magistrats et avocats dans*

*les sociétés contemporaines, IXième Congrès mondial de droit judiciaire (Rapports belges)*, Kluwer Antwerpen 1992, p. 3-124

- "De eigendom van het wild en de jachtvergunning. Of het onderscheid tussen rechtsvordering en recht om te procederen", in *Te PAS. Opstellen aangeboden aan prof. mr. P.A. Stein* , Kluwer Deventer / Tjeenk Willink Zwolle 1992, 253-271

- *La bonne foi dans la formation du contrat*, Rapport néerlandais fait à l'Association Henri Capitant des amis de la culture juridique française, Baton Rouge / New Orleans 1992, in *43. Travaux de l'Association Henri Capitant 1992 : La bonne foi.*, Paris 1994, p. 163-191

- "De bindende kracht van de overeenkomst", in *Rechtsbeginselen in het vermogensrecht, BW-krant Jaarboek 1993*, red. afdeling burgerlijk recht Rijksuniversiteit Leiden, Gouda Quint Arnhem 1993, p. 117-136

- "The validity and the contents of contracts", in *Towards a european Civil Code* (red. A.S. Hartkamp, M.W. Hesselink, E.H. Hondius, C.E. du Perron, J.B.M. Vranken), Kluwer / Ars aequi 1994, p. 159-199

- "Extinctive prescription under Belgian law", rapport voor de Académie internationale de droit comparé, in *Extinctive prescription, On the limitation of actions, Reports to the 14th international Congress of the international Academy of comparative law*, red. E. Hondius, Kluwer 1995, p. 41-73.

- "Quelques problèmes concernant le transfert et le nantissement du fonds de commerce : l'expérience belge", in *La propriété en mutation*, rapports du Colloque Tempus (Rouen - Praha - Leuven) à Rouen le 10 et 11 mai 1993, Presses de l'Université de Haute-Normandie, Rouen 1997, p. 59-68

- "Functions and character of uniform principles of contract law", in *Essays on european law and Israel*, ed. A.M. Rabello, Hebrew University Jerusalem 1996, p. 419-437. Zie ook http://mishpatim.mscc.huji.ac.il/sacher/rabel97e.htm

- "La confiance est bonne, mais un *dual ownership* est préférable. Onze éléments essentiels à prendre en considération lors de l'introduction d'une figure similaire au tust ou contrat fiduciaire en droit belge", in *Trust & fiducie*, verslagboek Colloquium Brussel 9 februari 1996, Bruylant 1997, p. 277-334

- "Rechtszekerheid en vertrouwensbeginsel in het Belgisch verbintenissenrecht", Preadvies VVSRBN 20-11-1997, in *Vertrouwensbeginsel en rechtszekerheid in België*, Tjeenk Willink 1997, p. 1-67

- "The binding character of contracts - causa and consideration", in *Towards a european Civil Code* (red. A.S. Hartkamp, M.W. Hesselink, E.H. Hondius), Second revised and expanded edition, Kluwer / Ars aequi 1998, 239-254

- "Harmonisation of the law on (substantive) validity of contracts (illegality and immorality)", in *Festschrift für Ulrich Drobnig*, ed. J. Basedow, K. Hopt & H. Kötz, Mohr Tübingen 1998, p. 195-207

- "De kwaliteitsrekening, zakenrechtelijk bekeken", in *Inzake kwaliteit. De kwaliteits- of derdenrekening naar Belgisch en Nederlands recht*, (red. E. Dirix & R.D. Vriensedorp); Kluwer Antwerpen/Deventer 1998, p. 55-80, ook (bijgewerkt) in X., *Kwaliteitsrekeningen* (reeks Voorrechten en hypotheken. grondige studies nr. 5) , Kluwer Antwerpen 1999, p. 37-65

- "Belgien", in *Beweis- Preuve - Evidence. Grundzüge des zivilprozessualen beweisrechts in Europa*, H. Nagel en E-M Bajons (red.), Nomos Baden-Baden 2000, (21 blz.), http://www.storme.be/beweisrecht.html

- Belgisch co-auteur van R. ZIMMERMANN & S. WHITTAKER, *Good faith in european contract law*, in de reeks "The common core of European private law", Cambridge Univ. Press 2000

## b) binnenland

- "Overdracht van roerende goederen, vestiging van pandrecht, eigendomsvoorbehoud : een poging tot systematisatie", in *Het zakenrecht : absoluut niet een rustig bezit, XVIII&deg; Postuniversitaire Cyclus Willy Delva 1991-1992*, Kluwer Antwerpen 1992, p. 403-510

- "Procesrechtelijke knelpunten bij de geldendmaking van rechten uit aansprakelijkheid voor de burgerlijke rechter", in *Recht halen uit aansprakelijkheid, XIX Postuniversitaire Cyclus Willy Delva 1992-1993*, Mys & Breesch Gent 1993, 189-238

- "Kontraktuele kontrolerechten en bewijsovereenkomsten", in *De behoorlijke beëindiging van overeenkomsten - La fin du contrat*, Jeune Barreau/Vlaams Pleitgenootschap /B.V.B.J., Brussel 1993, p. 57-109 (bespreking in *J.T.* 1993, 408)

- (samen met Marcel Storme), "De telefax in het procesrecht", *Liber amicorum Marcel Briers*, Mys & Breesch Gent 1993, 377-388 (recensie in *TGR* 1994, 167)

- "De bindende kracht van de overeenkomst tussen autonomie en vertrouwen", in *Liber amicorum Paul De Vroede* , Kluwer Antwerpen 1994, 1201-1220.

- "20 oorzaken van wantrouwen in het gerecht die verband houden met de regels betreffende of wijze van beroepsuitoefening door advokaten en magistraten", lezing Colloquium Interuniversitair Centrum Gerechtelijk Recht Leuven 16-12-1994, in *Het vertrouwen in het gerecht / La confiance dans la justice*, reeks IUCGR, red. P. Lemmens, Kluwer Antwerpen 1995, 26-58

- "De uitwendige rechtsgevolgen van verbintenissen uit overeenkomst en andere persoonlijke rechten : zgn. derde-medeplichtigheid aan wanprestatie, pauliana en aanverwante leerstukken", in *Overeenkomsten en derden : De externe gevolgen van overeenkomsten en de derde-medeplichtigheid*, BVBJ, Vlaams Pleitgenootschap, Jeune Barreau Brussel 1995, p. 111-189

- "Slotrede", in *Verzekeringen en gerechtelijke geschillen*, red. Vlaams Pleitgenootschap bij de balie te Brussel, Biblo Kalmthout 1996, p. 179-182.

- "De gevolgen van een defederalizering van de sociale zekerheid voor Brussel, grondwettelijke aspekten", in *De gevolgen voor Brussel van een eventuele (de)federalisering van de sociale zekerheid*, Verslagboek Colloquium KU Brussel - Vlaams Komitee Brussel 12-4-1997 (red. A. Delvaux, A. Monteyne & J. Degadt)

- "Trusts en fiduciaire figuren in het belgisch privaatrecht", *CBR Jaarboek* II, 1997-98, Maklu Antwerpen 1998, 485-558

- "De doorwerking van het anglo-amerikaanse recht in het Belgische contractenrecht", *CBR Jaarboek* II, 1997-98, Maklu Antwerpen 1998, 469-484

- "De drievoudige gelaagdheid van schuldvorderingen en hun bescherming", *Feestbundel Walter van Gerven*, Kluwer Antwerpen 2000, 329-342

-"De totstandkoming van overeenkomsten (inbegrepen vertegenwoordiging) in de beginselen van europees overeenkomstenrecht en het Belgische recht", in *Liber amicorum Jacques Herbots*, Kluwer Antwerpen 2002.

**Vertalingen**

- *Unidroit Beginselen van internationale handelsovereenkomsten*,

- Beginselen van europees overeenkomstenrecht, verschenen in *Tijdschrift voor privaatrecht* 2001, 1311-1352.

**Bijdragen in internationaal gereviewde tijdschriften**

- (samen met M.L. STORME) "De bindende derdenbeslissing naar belgisch recht", Preadvies voor de Jaarvergadering 1985 van de Vereniging voor de vergelijkende studie van het recht in België en Nederland,*TPR* (= *Tijdschrift voor Privaatrecht*) 1985, 713-748

- "De bepaling van het voorwerp van een verbintenis bij partijbeslissing", *TPR* 1988, 1259-1297

- "Goede trouw in geding en bewijs - De Goede trouw in het geding ? De invloed van de goede trouw in het privaat proces- en bewijsrecht", Rapport voor het 34e Wetenschappelijk Kongres van de Vlaamse Juristenvereniging, *TPR* 1990 nr. 2, 353-543 (in het ekstranummer pp. 311-484) (besproken door E. FORRIER in *TPR* 1990, extranummer (kongresnummer), en door P. TAELMAN in *R.W.*, 1989-90, 1507-1514)

- "The facts on trial", engelse vertaling van de openingsrede gehouden op de 101e plechtige openingszitting van het Vlaams Pleitgenootschap te Brussel, 9. *Current legal Theory* 1991, nr. 1 + 2, p. 1-34

- "Le procès des faits", vertaling van de openingsrede 101e plechtige openingszitting van het Vlaams Pleitgenootschap te Brussel, *Revue interdisciplinaire d'études juridiques*, 1992 - 28, p. 111-146

- "Walfords Chances under Belgian Law", Case note to the decision of the House of Lords in Walford v. Miles, *European Review of Private Law/Revue européenne de droit privé/ Europäische Zeitschrift für Privatrecht* , 1994, 315-327.

- "Perspektieven voor de bevrijdende verjaring in het vermogensrecht - met ontwerpbepalingen voor een hervorming", *TPR* 1994, 1977-2046

- "Applications possibles et caractéres généraux des projets de droit uniforme des contrats", *Revue de Droit International et Droit Comparé*, 1995, 309-324

- "Bedenkingen bij de door het Hof van cassatie gehanteerde wijze van rechtsvinding en rechtsopvatting. Tegelijk een bijdrage tot de studie van een onderschatte rechtsbron : de traditie", *TPR* 1995, 971-1048, eveneens op www.storme.be/cassatie&traditie.html

- "Constitutional review of disproportionately different periods of limitation of actions (prescription), *ERPL* 1997 nr. 1, p. 79-89.

- "Het vertrouwensbeginsel in het belgisch verbintenissenrecht", preadvies Vereniging voor de vergelijkende studie van het recht in België en Nederland 21 november 1997, *TPR* 1997, 1861-1935

- "Van trust gespeend ? Trusts en fiduciaire figuren in het belgisch privaatrecht", *TPR* 1998, 703-819 (recensie in *JT* 1999, 819)

- met E.M. KIENINGER, "Das neue Belgische Recht des Eigentumsvorbehalts", *RIW*. 1999, 94-105

- "Schuldnerpflichten, Vertragsstörung und Verantwortung (PECL, PICC, Wiener Kaufrecht, Gandolfi-Code, BGB-Entwurf)", Kongres "Wandlungen des Schuldrechts in Europa", Freiburg i.B. 11 september 2001, ter perse in *Zeitschrift für Europäisches Privatrecht* 2002

- "When does a freezing order become effective against the debtor of the receivables ?", *European review of private law* vol. 10, 2002 nr.1 , p. 134-141

- "Zur Bereicherungshaftung des Beschenkten gegenüber demjenigen, dessen Wertpapiere ihm der Schenker unter Ausnutzung einer Verfügungsvollmacht zugewendet hat. Note under BGH 4.2.1999", *European review of private law* 2002, 321-332.

**Artikelen in andere wetenschappelijke tijdschriften**

a) Artikelen in buitenlandse tijdschriften

- "Kausaliteit in het belgisch aansprakelijkheids- en verzekeringsrecht", Preadvies voor het Belgisch-Nederlands verzekeringsrechtelijk genootschap, *Verkeersrecht, wegverkeer / aansprakelijkheid / schade / verzekering* (Nederland), 1990, 225-231

- "Het proces van de feiten" in*TREMA (Tijdschrift voor de Rechterlijke Macht*, Nederland) 1992, 335-356

- "A kötelmi jog egységes alapelveinek funkciói és jellemzo"i", *Jogtudományi Közlöny* 1995, 353-357.

- "Over de verhouding tussen civielrechtelijke en strafrechtelijke verjaring en over diskrepantie tussen burgerrechtelijke verjaringstermijnen onderling - twee arresten van het belgisch grondwettelijk hof", *Ars Aequi* 1996, 650-655

b) Artikelen in binnenlandse tijdschriften

- "Het recht op informatie : betekenis en begrenzing", *IUS* 1979-80, 5-17 (samen met J. MUYLDERMANS).

- "Recht op informatie in het burgerlijk recht", *IUS* 1979-80, 40-45 (samen met C. HEYVAERT).

- "Het beleid van de wetgever", *IUS* 1979-80, 128-140 (samen met P. CEUNINCK en J. MUYLDERMANS).

- "Kontraktuele aansprakelijkheid vlg. de eisen van redelijkheid (goede trouw) of misbruik van kontraktueel recht ?", noot onder kh. Gent 1 juni 1984, *R.W. (Rechtskundig Weekblad)* 1984-85, 1725-1733

- "De invloed van de goede trouw op de kontraktuele schuldvorderingen", rede Leuven 7 juli 1989, *R.W.* 1989-90, 137-141, ook in *VRG-Berichten* 1990 nr. 1

- "De exceptio non adimpleti contractus, als uitlegvraag. Uitwerking van enkele aspekten in de verhouding tussen partijen, meer bepaald evenredigheid en volgorde van de prestaties", *R.W.* 1989-90, p. 313-324

- "De goede trouw in het geding - Een stellingname ter discussie", rede op het 34e Wetenschappelijk Congres van de Vlaamse Juristenvereniging, *R.W.* 1989-90, 1491-1493

- medewerking aan M.L. STORME, "La bonne foi : expression de la postmodernité en droit", in *La Bonne foi*, Actes du Colloque organisé le 30 mars 1990 par la Conférence du jeune barreau de Liège

- "Aspects de la causalité en droit des obligations et des assurances" (franse vertaling van het preadvies voor het Belgisch-Nederlands verzekeringsrechtelijk genootschap), *Bulletin des assurances / Tijdschrift voor verzekeringen*, 1990, 444-462

- "Een verwittigd advokaat is er twee waard - laattijdige conclusies en andere stukken", *Berichtenblad Nederlandse Orde van advocaten bij de balie te Brussel*, 1990-91, 115-116

- "L'obligation de procéder de manière diligente et raisonnable : une obligation indépendante du fond de l'affaire", *J.L.M.B. (Jurisprudence de Liège, Mons et Bruxelles)* 1991, 456-460

- "Rechtsverwerking na de cassatie-arresten van 17 mei 1990 en 16 november 1990 : springlevend", *R.W.*, 1990-91, 1073-1080

- "Bewijs- en verbintenisrechtelijke beschouwingen omtrent het stilzitten van de aangesprokene bij een faktuur en bij andere vormen van aanspraakbevestiging", *T.B.H. (Tijdschrift Belgisch Handelsrecht)*, 1991, 463-503, www.storme.be/faktuur.html

- "Strijdige standaardvoorwaarden : wie laatst lacht lacht niet altijd best", noot onder kh. Gent 24 april 1990, *T.B.H.* 1991, 557-559

- "Het ingaan en de terugwerkende kracht van de ontbinding van wederkerige overeenkomsten", *T.B.B.R.*, 1991, p. 101-119

- "Variaties op het thema verjaring en verwerking in huurzaken", *R.W.*, 1991-92, 994-997

- "De toekomst van het burgerlijk proces : het proces van de feiten ?", Openingsrede 101e plechtige openingszitting van het Vlaams Pleitgenootschap te Brussel, 8 november 1991, *Rechtskundig Weekblad* 1991-92, 1441-1454

- "Moet mevrouw te voet boodschappen doen nu de auto van haar man werd aangereden ? Of : de maat van de schadebeperkingsplicht van de benadeelde", *Recente Cassatie* 1992, 160-161

- met H. COUSY, "Recht en gelijkheid - een tot naschrift herwerkte inleiding", XXXVe Congres van de Vlaamse Juristenvereniging, *R.W.*, 1992-1993, 1

- "Repelsteeltje, de windmolen en de zwaanridder. Of : het Hof van Cassatie en de rechtsverwerking", *Recente cassatie* 1992, nr. 21

- "La lampe magique de Saladin. Note sous Cass., 21 février 1992", *J.L.M.B.* 1992, nr. 41 p. 1458

- "Onhandelbare gedachten over de toekomst van het verhandelbaar vermogensrecht", *Droit des affaires - Ondernemingsrecht*, 1992, nr. 26, 137-163

- "de Warrant R.I.P. ?", noot onder Cass. 19 november 1992, *Recente Cassatie*, 1993, p. 15-18

- "Het verzuim door eigen verklaring van de schuldenaar en de betekenis daarvan in aannemingsovereenkomsten", *T.B.H.*, 1993, 239-241

- "De wonderlamp van Saladin. Of : hoe wil het Hof van Cassatie de beperkende werking van de goede trouw gaan toetsen ?", *T. Not (Tijdschrift voor notarissen)*, 1993, 381-384

- "De wijde mantel van de huurovereenkomst biedt ook plaats aan zuivere financieringshuur zonder vrijwaring door de lessor", *Recente Cassatie*, 1993, 179-180

- "Rechtsopvolging onder bijzondere titel tijdens het geding in België en Nederland", *R.W.*, 1993-94, 169-186, www.storme.be/rechtsopvolging.html

- "Het misverstand : de vertrouwensleer geldt ook tussen partijen", noot onder Hof Brussel 26 mei 1992, *T.B.B.R. (Tijdschrift voor Belgisch Burgerlijk Recht)*, 1993, nr. 4/5, p. 336-341

- "De ingebrekestelling ad futurum en haar gevolgen", *T.B.H.*, 1994 , nr. 2, p. 141-145

- "De bescherming van de wederpartij en van het dwingend recht bij middellijke vertegenwoordiging, m.b. naamlening, in het burgerlijk procesrecht, en de betwistbare verwoording daarvan in de cassatiearresten van 25 november 1993", *Proces & bewijs* 1994, 53-61

- "Is het begrip wetsontduiking noodzakelijk om de opzegging van de pacht voor eigen gebruik te weigeren aan de koper van een vruchtgebruik voor het leven ?", *T. Not.*, 1994, p. 257-261.

- "Tegenstrijdige arresten m.b.t. de rente verschuldigd bij verzuim van de schuldeiser van een geldschuld ? Verregaande gevolgen van het laten aanslepen van een geding !", *Recente cassatie* 1994, 282-284.

- "De bewijswaarde van het proces-verbaal van vaststelling van materiële feiten door een gerechtsdeurwaarder op verzoek van particulieren (art. 516 Ger.W.) en aanverwante

vragen", *R.W.*, 1994-95, 345-352 (*), eveneens in geaktualizeerde versie én in franse vertaling daarvan in *De gerechtsdeurwaarder / L'huissier de justice*, 1995 nr. 2.704.

- "Bedenkingen over eigendomsoverdracht van en zakelijke rechten op onroerende goederen bij een konflikt tussen de beslagleggende schuldeiser van de koper en zijn hypotekaire kredietgever", noot onder Hof Gent 21 december 1993, *R.W.*, 1994-95, 825-827

- "De Lebbeekse uitweg uit een processuele valstrik : ten processe optreden in een andere hoedanigheid en optreden krachtens een ander recht", *Proces & Bewijs*, 1995, 43-44.

- "De verjaring van de burgerlijke vordering al dan niet voortspruitend uit een misdrijf eengemaakt : ja, maar hoe ?"*R.W.*, 1994-1995, 1349-1350

- "Het kausale karakter van de hypoteekvestiging, namelijk als uitvoering van een verbintenis tot hypoteekvestiging", *AJT (Algemeen Juridisch Tijdschrift)* 1995, 506-507

- "Derdenverzet door de curator tegen de aanstelling of vervanging van een pandverzilveraar : nogmaals de schizotyme curator ?", noot onder cass. 16 december 1994, *Recente Cassatie* 1995 nr. 6, p. 175-177

- "Mogelijkheden en algemene kenmerken van eenvormig overeenkomstenrecht", *Jura Falconis* 1995, 491-504

- "Naamlening bij executie na opvolging in het geldend te maken recht", *R.W.*, 1995-1996, 327-331

- "Hoever reikt de regel van de onherroepelijkheid van een lastgeving van gemeenschappelijk belang - in het bijzonder bij enkele toepassingen in de notariële praktijk", *T. Not.*, 1996, 7-24

- met E. DIRIX, "Eigendomsvoorbehoud in het Ontwerp van Faillissementswet : hopeloos onsamenhangend", *R.W.* 1995-1996, 1421-1424

- "Vertrouwen is goed, dual ownership is beter. Elf essentialia bij de invoering van een trustachtige figuur of fiduciaire overeenkomst in het belgische recht", *R.W.* 1996-97, 137-154

- "Een web van formanten - een spel van beginselen", in *Tijd-Schrift, Juridisch Cahier*, 1996-97, nr. 2, 59-61 (over rechtsonderwijs en rechtsvergelijking), ook op http://www.storme.be/rechtsonderwijs.html

- "Aansprakelijkheid voor gerechtskosten en aansprakelijkheid van de advokaat", *Proces & bewijs*, 1997, 2-4

- "Zekerheidsoverdracht, numerus clausus van zakelijke rechten, en andere zekerheidsmechanismen na het cassatie-arrest van 17 oktober 1996", *R.W.* 1996-97, 1395-1403

- "Vragen rond rente", lezing studiedag consumentenrecht van de Vereniging van vrede- en politierechters en de balie te Brussel, Brussel 15 februari 1996, *Tijdschrift voor Vrederechters* 1997, 196-203

- "Het grondboek : de vereiste hervorming van de regels betreffende de verkrijging van onroerende zakelijke rechten", pre-advies Wetenschappelijk Kongres Vlaamse Juristenvereniging Gent 25 april 1998, *RW* 1997-1998, p. 1173-1187, www.storme.be/grondboek.html

- "Schipbreuk met toeschouwers. Rechts- en vertrouwensbescherming tegen de loodsen van het recht", lezing Colloquium Retro-activiteit van rechtsregels, in *Jura Falconis* 1999, 441-453

- "De ontvangstleer bij derdenbeslag en andere kennisgevingen die de betalingsverplichting van een schuldenaar wijzigen, en de verzendingsleer bij rechtshandelingen die een termijn doe ingaan", *R.W.* 1999-2000 nr. 39, 1338-1342

- met F. JUDO, "Blokkades : de overheid tussen voorzichtigheid en laksheid", *F.E.T.* 20 september 2000

- "Naar een Vlaamse justitie ? De defederalisering van het gerecht", openingsrede balie Mechelen 7 oktober 2000, *R.W.* 2000-2001, nr. 30, 1113-1120; in *Ad-vocare* mei 2001; in *De Grote Raad* vol. 8, november 2000, p. 3-23; in *Het Verbond* 2001, nr. 2 en 3; in *Secessie* 2001 nr. 3; ook op http://www.storme.be/Vlaamsejustitie.html

- "De invoering van de elektronische handtekening in ons bewijsrecht - een inkadering van en commentaar bij de nieuwe wetsbepalingen",*Rechtskundig Weekblad* 2000-2001, 1505-1525, http://www.storme.be/elektronischehandtekening.html

- Het verrichten van rechtshandelingen door middel van nieuwe telecommunicatiemiddelen - de nieuwe wetsbepalingen ingekaderd in de algemene leer van de kennisgeving, *Rechtskundig Weekblad* 2001-2002, 433-447, http://www.storme.be/elektronischehandtekening.html

# EXHIBIT 3

De Standaard Online
29/06/2001

**KPMG top under suspicion in L&H case**

BRUSSELS – Examining magistrate Kristof Vulsteke placed the legal entity KPMG, Theo Erauw, President of KPMG Belgium, and KPMG partner William Van Aerde under suspicion in the Lernout & Hauspie case. Former KPMG director Paul Behets, who refused any comment yesterday, would also have been placed under suspicion.

Examining magistrate Vulsteke already put ex KPMG top executives under suspicion during the searches in the Lernout & Hauspie case. Attorney Lievens (Eubelius) confirmed this. KPMG is accused of having certified the accounts of L&H without having noticed the irregularities. In this stage of the investigation, KPMG is accused of negligence and (as of yet) no wrongful misconduct.

In addition to Van Aerde, who has been signing off on the L&H accounts since the second half of 1999, Erauw, President of KPMG Belgium, and the legal entity of KPMG itself, have been put under suspicion. Behets, the previous KPMG partner who has been auditing the books of L&H for about 10 years, would also have been placed under suspicion. Behets declined to comment yesterday.

The number of people under suspicion in the L&H case now totals eight. Previously, Gaston Bastiaens, Jo Lernout, Pol Hauspie, Carl Dammekens, and Nico Willaert had been placed under suspicion.

All this occurred just before the company is holding its annual shareholders' meeting today. Examining magistrate Kristof Vulsteke already performed a search at the law firm of Allen & Overy Belgium (formerly Loeff Claeys Verbeke) a little over a week ago.

Partner Wim Dejonghe said yesterday that he had no information that they also had been placed under suspicion. "If this were to happen, we could defend ourselves, because our attorney-client privilege would no longer apply; if it does not happen, we would look better in the press. As far as I'm concerned, it's a neutral matter."

http://www.standaard.be/nieuws/economie/index.asp?doctype=detail.asp&ArticleID=DST29062
001_052

De Standaard Online
29/06/2001

### KPMG-top in verdenking in zaak L&H

BRUSSEL -- Onderzoeksrechter Kristof Vulsteke heeft de rechtspersoon KPMG, Theo Erauw, de voorzitter van KPMG België, en KPMG-partner William Van Aerde in verdenking gesteld in de zaak Lernout & Hauspie. Ook ex-KPMG-commissaris Paul Behets zou in verdenking gesteld zijn, maar die weigerde gisteren commentaar.

Onderzoeksrechter Vulsteke ging eergisteren al over tot de inverdenkingstellingen van ex-KPMG-toplui bij de huiszoekingen in de zaak Lernout & Hauspie. Advocaat Jef Lievens (Eubelius) bevestigde de inverdenkingstellingen. KPMG wordt verweten de boekhouding van L&H geattesteerd te hebben zonder de onregelmatigheden gezien te hebben. In deze fase van het onderzoek wordt KPMG nalatigheid verweten en (nog) geen kwaad opzet.

Naast Van Aerde, die sinds de tweede helft van 1999 de boeken van L&H aftekende, is ook Erauw, de voorzitter van KPMG België in verdenking gesteld en de rechtspersoon KPMG zelf. Ook Behets, de voormalige KPMG-partner die circa tien jaar lang de boeken van L&H controleerde, zou in verdenking gesteld zijn. Behets wou gisteren desgevraagd geen commentaar geven.

Het aantal in verdenking gestelde personen in de zaak L&H komt daardoor op acht. Eerder werden Gaston Bastiaens, Jo Lernout, Pol Hauspie, Carl Dammekens en Nico Willaert in verdenking gesteld.

De nieuwe inverdenkingstellingen gebeurden net voordat het bedrijf vandaag zijn jaarlijkse aandeelhoudersvergadering houdt. Onderzoeksrechter Kristof Vulsteke ging goed een week geleden al over tot huiszoekingen bij het advocatenkantoor Allen & Overy Belgium (het vroegere Loeff Claeys Verbeke).

Partner Wim Dejonghe zei gisteren geen informatie te hebben dat ook zij in verdenking zouden zijn gesteld. ,,Als het zou gebeuren, kunnen we ons verdedigen omdat ons beroepsgeheim dan niet meer geldt; als het niet gebeurt, komen we in de pers minder negatief naar buiten. Voor mij is het een neutrale zaak."

http://www.standaard.be/nieuws/economie/index.asp?doctype=detail.asp&ArticleID=DST09122000_083
**KPMG: "Outside and independent"**

(djd)
09/12/2000
BRUSSEL -- ,"We are the outside and independent auditor of Lernout & Hauspie. Our professional ethics code prohibits us from making our draft work documents available to the internal audit committee of the company." This was the reaction of KPMG President Theo Erauw yesterday to the court decisions in Ypres (Ieper).

Since questions arose about L&H and the role of internal auditor KPMG, Erauw has been strictly following professional ethics and confidentiality rules. Erauw is tight-lipped about the audit report that is now an unheard-of 3 months late. ,,When the audit is completed, we will present it to our client. I can't give any details."
In the meantime it is clear that the inquiry can only be completed when the client fully cooperates. Several observers have indicated that this is at the bottom of the long wait.
Erauw is also very strict regarding professional confidentiality. "What others do, or what has happened in the past (*editor's note: auditors who hold press conferences to say that they have faith in the matter*), does not concern me. We will only come out when Lernout & Hauspie allows us to do so."
However, Erauw does explain the position that KPMG refuses to provide information to the company. "I am not a representative of L&H. We were commissioned by the Board of Directors. We had written and oral contacts and cooperated with the inside auditing committee that was requested by a law firm (*editor's note: Arthur Andersen and Bryan Cave*). But we will not reveal our working papers. It would expose our internal operations, which is prohibited under the rules of our professional organization, the IBR. After all, we are an outside firm, we are independent, and we're not related to internal audits. We only guarantee delivery of the final results to our client."

http://www.standaard.be/nieuws/economie/index.asp?doctype=detail.asp&ArticleID=DS
T09122000_083

**KPMG: ,,Extern en onafhankelijk"**

(djd)
09/12/2000
BRUSSEL -- ,,Wij zijn de externe en onafhankelijke revisor bij Lernout & Hauspie. De
deontologie van ons beroep verbiedt ons onze onafgewerkte werkdocumenten ter
beschikking te stellen van het interne auditcomité van het bedrijf." Dat zei KPMG-
voorzitter Theo Erauw gisteren in een reactie op de rechtbankuitspraken in Ieper.

Erauw houdt zich al sinds er vragen zijn gerezen bij L&H en de rol van huisrevisor
KPMG, strikt aan de deontologie en het beroepsgeheim. Over het uitblijven van het
auditrapport, dat nu al een ongeziene 3,5 maanden op zich laat wachten, wil Erauw
niets kwijt. ,,Op het moment dat de audit gedaan is, zullen we hem presenteren aan
onze opdrachtgever. Ik kan geen enkel detail geven."
Het is ondertussen wel duidelijk dat de studie pas afgerond kan worden, als de
opdrachtgever volop meewerkt. Verschillende waarnemers hebben aangegeven dat
hier de verklaring ligt voor het lange wachten.
Ook over het beroepsgeheim zelf, is Erauw strikt. ,,Wat anderen doen, of wat in het
verleden gebeurd is (*revisoren die persconferenties geven om hun vertrouwen uit te
spreken, nvdr* ), is niet mijn zaak. Wij komen pas naar buiten als Lernout & Hauspie ons
dat toelaat."
Wel nuanceert Erauw de stelling dat KPMG informatie weigert aan het bedrijf. ,,Ik ben
geen vertegenwoordiger van L&H. Wij hebben van de raad van bestuur een opdracht
gekregen. Met het intern auditcomité dat door een advocatenkantoor (*Arthur Andersen
en Bryan Cave, nvdr* ) is gevraagd, hebben we schriftelijk en mondeling contact gehad
en hebben we samengewerkt. Maar werkpapieren stellen we niet ter beschikking. Dat
zou onze interne werking blootleggen en dat is verboden door de regels van onze
beroepsorganisatie, het IBR. Wij zijn immers extern en onafhankelijk en staan los van
interne audits. Enkel het finale resultaat garanderen wij af te leveren aan onze
opdrachtgever."



# First Translation Company

321 Fifth Avenue
New York, NY 10016
Tel: (212) 679-4401 • Fax: (212) 679-6790
Email: projects@1translation.com
Web Site: www.1translation.com

## CERTIFICATE OF ACCURACY

This is to certify that the attached translation of a _DOCUMENT_ from _FLEMISH_ into _ENGLISH_, stamped "Certified Translation" with the green company stamp, is, to the best of our knowledge and belief, a true, accurate and complete translation of the document presented to us.

_Roxana Huhulea_

FIRST TRANSLATION COMPANY
By: Roxana Huhulea

State of New York
County of Nassau

Sworn and subscribed to before me
on this _6th_ day of _MAY_, 2002.

_____
Notary Public

De Standaard Online
29/06/2001
**KPMG top under suspicion in L&H case**
BRUSSELS – Examining magistrate Kristof Vulsteke placed the legal entity KPMG, Theo Erauw,
President of KPMG Belgium, and KPMG partner William Van Aerde under suspicion in the Lernout &
Hauspie case. Former KPMG director Paul Behets, who refused any comment yesterday, would also
have been placed under suspicion.
Examining magistrate Vulsteke already put ex KPMG top executives under suspicion during the searches
in the Lernout & Hauspie case. Attorney Lievens (Eubelius) confirmed this. KPMG is accused of having
certified the accounts of L&H without having noticed the irregularities. In this stage of the investigation,
KPMG is accused of negligence and (as of yet) no wrongful misconduct.
In addition to Van Aerde, who has been signing off on the L&H accounts since the second half of 1999,
Erauw, President of KPMG Belgium, and the legal entity of KPMG itself, have been put under suspicion.
Behets, the previous KPMG partner who has been auditing the books of L&H for about 10 years, would
also have been placed under suspicion. Behets declined to comment yesterday.
The number of people under suspicion in the L&H case now totals eight. Previously, Gaston Bastiaens,
Jo Lernout, Pol Hauspie, Carl Dammekens, and Nico Willaert had been placed under suspicion.
All this occurred just before the company is holding its annual shareholders' meeting today. Examining
magistrate Kristof Vulsteke already performed a search at the law firm of Allen & Overy Belgium (formerly
Loeff Claeys Verbeke) a little over a week ago.
Partner Wim Dejonghe said yesterday that he had no information that they also had been placed under
suspicion. "If this were to happen, we could defend ourselves, because our attorney-client privilege would
no longer apply; if it does not happen, we would look better in the press. As far as I'm concerned, it's a
neutral matter."
http://www.standaard.be/nieuws/economie/index.asp?doctype=detail.asp&ArticleID=DST09122000_083
**KPMG: "Outside and independent"**

(djd)
09/12/2000
BRUSSEL – ,"We are the outside and independent auditor of Lernout & Hauspie. Our professional ethics
code prohibits us from making our draft work documents available to the internal audit committee of the
company." This was the reaction of KPMG President Theo Erauw yesterday to the court decisions in
Ypres (Ieper).

Since questions arose about L&H and the role of internal auditor KPMG, Erauw has been strictly following
professional ethics and confidentiality rules. Erauw is tight-lipped about the audit report that is now an
unheard-of 3 months late. ,,When the audit is completed, we will present it to our client. I can't give any
details."
In the meantime it is clear that the inquiry can only be completed when the client fully cooperates. Several
observers have indicated that this is at the bottom of the long wait.
Erauw is also very strict regarding professional confidentiality. "What others do, or what has happened in
the past (*editor's note: auditors who hold press conferences to say that they have faith in the matter*),
does not concern me. We will only come out when Lernout & Hauspie allows us to do so."
However, Erauw does explain the position that KPMG refuses to provide information to the company. "I
am not a representative of L&H. We were commissioned by the Board of Directors. We had written and
oral contacts and cooperated with the inside auditing committee that was requested by a law firm (*editor's
note: Arthur Andersen and Bryan Cave*). But we will not reveal our working papers. It would expose our
internal operations, which is prohibited under the rules of our professional organization, the IBR. After all,
we are an outside firm, we are independent, and we're not related to internal audits. We only guarantee
delivery of the final results to our client."

CERTIFIED TRANSLATION
First Translation Company



EXHIBIT 4

**PARKET van de PROCUREUR des KONINGS te IEPER**

Grote Markt 1, 8900 Ieper                    ☎ 057/22.48.11        ✆ 057/20.36.74
Kabinet van de procureur des Konings

*Aan dhr. M. Storme*
*advocaat*
*Verenigingstraat 28*
*te 1000 Brussel*

Uw referte: -
Onze referte: IE71.98.464-00/A
Bijlagen: -

Mijnheer de Advocaat,

Met verwijzing naar uw schrijven van 20 maart 2002 betreffende het gerechtelijk onderzoek tegen Jo Lernout, Paul Hauspie, KMPG België e.a., kan ik bevestigen dat het gerechtelijk onderzoek ondermeer loopt tegen K.P.M.G.

Hoogachtend.

Ieper, 22 maart 2002
De procureur des Konings

J.M. COPPENS

## OFFICE of the PUBLIC PROSECUTOR OF YPRES

Grote Markt 1, 8900 Ieper                   Tel. 057/22.48.11     Fax 057/20.36.74
Office of the Public Prosecutor

To Mr. M. Storme
Attorney
Verenigingstraat 28
1000 BRUSSELS

Your reference: -
Our reference: IE71.98.464-00/A
Enclosures: -

Mr. Attorney,

Referring to your letter of 20 March 2002 concerning the legal investigation against Jo Lernout, Paul Hauspie, KMPG Belgium and others, I can confirm that the legal investigation is directed, inter alia, against K.P.M.G.

Yours sincerely,

Ypres, 22 March 2002
The Public Prosecutor

J.M. COPPENS

Certified true translation of the document drafted in Dutch,

Marie-Rose Reynewaeter
Sworn translator at the Brussels Courts
19 April 2002

M.R. REYNEWAETER
VERTALING
HAZELEERSTRAAT 90
9400 OKEGEM